**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
(Alexandria Division)

| | |
|---|---|
| **JOSEPH SALMOIRAGHI,** ) | |
| 7239 Withers Place ) | |
| Colorado Springs, CO 80922 ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Civil Action No. _____** |
| ) | |
| **VERITISS, LLC** ) | |
| <u>**Service Registered Agent**</u> ) | |
| CARMEN POWELL ) | |
| 1897 Preston White Drive ) | |
| Suite 200 ) | |
| Reston, VA 20191 ) | |
| ) | |
| Defendant. ) | |

**COMPLAINT**

1. Plaintiff Joseph Salmoiraghi ("Plaintiff" or "Mr. Salmoiraghi") files this action for declaratory and monetary relief against his former employer, Veritiss, LLC ("Defendant" or "Veritiss") based on the harm that he suffered as a result of Defendant treating him adversely after he disclosed his disability and made multiple requests for reasonable accommodations that were denied.

2. This action is brought for disability discrimination, retaliation, and hostile work environment pursuant to the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), and for disability discrimination under the Virginia Human Rights Act, Va. Code Ann. § 2.2-3900 *et seq.* ("VHRA").

## JURISDICTION AND VENUE

3.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action raises allegations under federal laws.

4.  Venue is proper under 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to this Complaint took place in Reston, VA where Veritiss is located and where Mr. Salmoiraghi worked.

5.  This Court has supplemental subject matter jurisdiction over Mr. Salmoiraghi's VHRA claim pursuant to 28 U.S.C. § 1367, as it arises from a common nucleus of facts as his federal law claims.

6.  At all times relevant to this complaint, Defendant was Plaintiff's employer under the ADA, and VHRA.

7.  In consideration of the foregoing, personal jurisdiction and venue are proper in this Court.

## PARTIES

8.  At all times relevant to this complaint, Plaintiff , was employed at the Veritiss. Mr. Salmoiraghi began working for Veritiss in June 2012 as a Mid-Level Counter-Intelligence Analyst. Prior to being wrongfully terminated on October 11, 2013, he held the title of Senior Counter-Intelligence Analyst/Team Lead at Veritiss.

9.  Defendant, Veritiss, is a corporation that works with the federal government on defense contracts. Veritiss is located in Reston, VA.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10. On or about December 6, 2013, Plaintiff contacted the Fairfax County Office of Human Rights and Equity programs regarding discrimination, retaliation, and hostile work environment he faced at Veritiss and filed a charge of discrimination. His charge was filed

2

within 180 days after one or more of the alleged unlawful employment practices in violation of the ADEA had occurred.

11. On or about August 5, 2019, Plaintiff received via USPS mail, a Notice of Right to Sue from the EEOC.  This notice gave Plaintiff ninety days from the receipt of the notice to file his Complaint related to his ADA claims, which is on or before November 4, 2019.

12. Mr. Salmoiraghi has exhausted all administrative remedies required to bring the instant complaint.

## FACTS

**Exemplary Performance**

13. On June 4, 2012, Mr. Salmoiraghi's employment with Veritiss commenced when he accepted a position as a Mid-Level Counter-Intelligence Analyst.

14. Because of his exemplary performance and leadership, he was promoted to Senior Counter-Intelligence Analyst/Team Lead within seven months of him working at Veritiss.

15. On two separate occasions, his boss, Ron Sturmer told Mr. Salmoiraghi that he was one of their top analysts and that they did not want to lose him and would not let him go.

**Notice of Disability**

16. In February 2013, Mr. Salmoiraghi was diagnosed with Post-Traumatic Stress Disorder/Anxiety Disorder ("PTSD/AD") after serving as a contractor in Afghanistan.

17. Sometime thereafter, he informed his bosses, Joel Turner and Mr. Sturmer of his diagnosis and requested as a reasonable accommodation that he be given permission to use his lunchtime for meditation or for short walks to help him remain focused.

18. He also requested that his bosses, Mr. Turner and Mr. Sturmer address any issue with him immediately that could cause him anxiety or stress, instead of delaying the conversation

given that his PTSD/AD symptoms include anxiety or panic attacks, increased heart rate, high blood pressure, dizziness, tightening of his chest muscles causing severe chest pains, hyperventilation, and fear of death.

**Employee Work Ethic Issues**

19. In March 2013, Veritiss was under a fraud investigation by the government customer due to suspected timecard abuse and work production issues. Mr. Turner told Mr. Salmoiraghi to "keep an eye on" the employees that he supervised, as one employee was under investigation.

20. Mr. Turner directed Mr. Salmoiraghi to "make sure they [we]re working" because the government customer had complained that Jason Faulcon and Judy Bernacki, were socializing too much at work and were not being productive.

21. Mr. Salmoiraghi followed Mr. Turner's directive and began monitoring the employees more closely and checking to make sure that they were at their desks working.

22. Mr. Faulcon and Ms. Bernacki let Mr. Salmoiraghi know via email that they were unhappy with him monitoring them.

23. Mr. Salmoiraghi spoke to Mr. Faulcon and Ms. Bernacki individually to address their concerns and learned that they feared being fired. He explained why he was monitoring them. They told him they understood and that they could move on from the subject.

24. Around April/May 2013, multiple employees whom Mr. Salmoiraghi supervised including Ian Hull, Justin Baskerville, Gregory Innocent and Rachael Bass informed him that several employees whom he supervised, including the very same, Ms. Bernacki and Mr. Faulcon, in addition to Sarah Wicks, Matthew Miller, Jason Melchor, Julie Babson, and Tracy Austin

were <u>conspiring against him during work hours because he was holding them accountable for their productivity</u>.

25. Mr. Hull, Mr. Baskerville, Mr. Innocent, and Ms. Bass expressed to Mr. Salmoiraghi that they felt it was wrong, disrespectful, and improper for their colleagues to act that way because they believed that if anyone had a problem with him, they should come to him first.

26. Mr. Innocent, Hull, Baskerville voiced their support for Mr. Salmoiraghi and also mentioned how he had helped them become more productive at work.

27. Mr. Turner later explained to him that when he investigated the employees' complaints, he received a document <u>with no names</u> of any of the individual complainants.

28. After Mr. Turner finally received the names of the individuals who had submitted the complaints, he spoke to each person individually.

29. Mr. Turner later reported to Mr. Salmoiraghi that no one "took ownership of any of the complaints". He told Mr. Salmoiraghi that he considered the complaints "unfounded". Mr. Salmoiraghi took Mr. Turner at his word and did not think anything more of the matter.

30. Mr. Salmoiraghi continued to keep his staff's productivity up and kept an eye on those who were deemed troublesome. He eventually had to fire one of his team members due to poor performance. Because of this, some of his staff might have feared him. Overall, the government was happy with his teams' increased productivity. The Government lead and his head people told Mr. Salmoiraghi directly during routine meetings, and it was expressed from Veritiss, as well.

31. Given the productivity improvement, Mr. Salmoiraghi was surprised when on August 22, 2013, Mr. Turner told him that there was something he was upset about concerning him, but would not tell him what it was.

32. Mr. Salmoiraghi made a request for a reasonable accommodation that Mr. Turner address the issue with him immediately, but Mr. Turner refused.  As a result, Mr. Salmoiraghi suffered an anxiety attack, increased heart rate, high blood pressure, dizziness, and tightening of his chest muscles, which caused him severe chest pains, and hyperventilation.  He had to depart work early due to his anxiety attack.

33. The very next day, August 23, 2013, Mr. Salmoiraghi suffered an adverse employment action when Mr. Turner stripped him of complete supervisory authority.

34. When Mr. Salmoiraghi asked Mr. Turner why he was stripping him of his supervisory authority, Mr. Turner responded, "I cannot tell you.  I am not allowed to tell you."

35. Two days later, August 25, 2013, Mr. Turner informed Mr. Salmoiraghi that he was not officially stripped of any responsibilities and that Mr. Sturmer was the one who told him to take away Mr. Salmoiraghi's supervisory authority, but only for the day, on August 23rd.

**Protected Activity**

36. On August 26, 2013, Mr. Salmoiraghi filed an internal EO Complaint with HR, where he noted the discrimination, retaliation, and hostile work environment that he was facing based on his PTSD/AD disability.

37. Mr. Salmoiraghi also retained an attorney to help him resolve his employment issues with Veritiss.

38. On September 13, 2013, Mr. Turner made false claims against Mr. Salmoiraghi in a Memorandum for Record.

39. Mr. Salmoiraghi spoke to the witnesses who had made the alleged statements.  The witnesses denied that they made the alleged statements.

40. When Mr. Salmoiraghi approached Mr. Turner and Mr. Sturmer with proof that the statements in two of the paragraphs were false, they refused to revise the disciplinary memo.

41. During the conversation, Mr. Salmoiraghi felt that Mr. Turner and Mr. Sturmer were trying to get a reaction out of him.

42. On September 19, 2013, Mr. Gotwalt interviewed Mr. Salmoiraghi for the investigation of the fabricated employee complaints that Mr. Turner had earlier said were unsupported and "unfounded". During the investigation interview, Mr. Gotwalt verbally harassed and threatened Mr. Salmoiraghi, slamming his fist on the table in rage and threatening to "take [Mr. Salmoiraghi] outside".

43. The very next day, on September 20, 2013, Mr. Salmoiraghi's counsel sent two letters to Veritiss in an attempt to resolve Mr. Salmoiraghi's claims and lead to a better and non-hostile work environment.

44. Veritiss failed to respond to Mr. Salmoiraghi's counsel's communications.

**Veritiss Failure to Engage in the Interactive Process**

45. Veritiss failed to respond to all of Mr. Salmoiraghi's counsel's attorney's attempts to substantively address Mr. Salmoiraghi's PTSD/AD-related employment concerns or reasonable accommodations.

46. Mr. Sturmer told Mr. Salmoiraghi that they had investigated his claims and found that there was no discrimination or retaliation.

**Retaliation**

47. After Mr. Salmoiraghi filed his EO complaint and his attorney sent letters seeking to speak with management regarding Mr. Salmoiraghi's work conditions, things got worse for Mr. Salmoiraghi at work.

48. Mr. Salmoiraghi believes Carmen Powell (CEO), Mr. Turner and Mr. Sturmer were punishing and retaliating against him for pursuing his legal rights and trying to push him to the edge, so that he would act out.

49. Thankfully, Mr. Salmoiraghi is not the violent type, so their attempts to get him to act out were unsuccessful. He suffered with the intense stress and anxiety.

**Demotion**

50. On September 23, 2013, Mr. Salmoiraghi continued to endure in the hostile work environment, and suffered from reprisal at the hands of Mr. Turner and Mr. Sturmer, when he lost total supervisory authority and was demoted to a Mid-Level Analyst position for pretextual reasons that were the result of a non-neutral non-third party investigation of alleged employee complaints by at least one biased party, Mr. Gotwalt, who had verbally harassed and threatened him on September 19, 2013, during an investigation interview.

51. Mr. Salmoiraghi confirmed with at least one employee who allegedly made complaints against him during the investigation and who expressed concern about his demotion, that Mr. Gotwalt had taken his comments out of context.

52. Based on the employee's report, Mr. Salmoiraghi believes that Veritiss went on a "fishing expedition" to trump up charges against him as pretext to demote him because they did not want an employee with PTSD/AD working for them. Never mind, that he had honorably served his country and was a veteran with a family to support.

53. On September 23, 2013, Mr. Salmoiraghi was placed under the supervision of Mr. Faulcon, who Mr. Salmoiraghi had counseled in the past. When Mr. Salmoiraghi spoke with Mr. Faulcon about this, he informed Mr. Salmoiraghi the "past is the past" and that they could

move on.  Mr. Salmoiraghi did not trust him given the prior complaint he had file against Mr. Salmoiraghi after Mr. Salmoiraghi was monitoring his productivity at work.

**Ongoing Denial of Reasonable Accommodations - Failure to Transfer**

54. On September 23, 2013, Mr. Salmoiraghi requested that Mr. Sturmer transfer him to either the Crystal City or Bolling Air Force Base offices to remove him from Mr. Turner and Sturmer's line of supervision.

55. Mr. Sturmer responded in an email on September 24, 2013, stating that there were no intelligence analyst positions open at either location, and that one may come open at the end of the year.

56. Veritiss had allowed other employees to swap contracts and fill in for other employees so, Mr. Salmoiraghi thought that be afforded the same accommodation at another office until a position opened up at the Crystal City or Bolling Air Force Base offices.

**New LWOP Rules Just for Mr. Salmoiraghi**

57. On September 28, 2013, Mr. Salmoiraghi suffered from another act of reprisal when Mr. Sturmer sent me an email announcing that he was being required to provide a statement from a competent medical authority in order to use unscheduled Leave Without Pay ("LWOP") for illness.

58. Mr. Salmoiraghi replied in an email citing the Employee Handbook ("Handbook"), Section 5, subsection 5.4, and Section 6, subsections 6.14 and 6.14.5, which addressed LWOP procedures.  Nowhere in the Handbook did Veritiss require an employee to provide a note from a medical professional to take time off or use LWOP.

59. Mr. Salmoiraghi believes this constituted disparate treatment and retaliation given that this was a new rule that was only being applied to him.

9

**Hostile Work Environment**

60. Through singling out and systematically targeting Mr. Salmoiraghi on the basis of his disability, Mr. Sturmer and Mr. Turner created a hostile work environment for Mr. Salmoiraghi.

61. On October 3, 2013, Mr. Salmoiraghi's counsel wrote Veritiss a third time and provided them with a letter from his therapist where his therapist recommended that he be moved to a new office location given that the current "hostile work environment" was exacerbating his PTSD symptoms.

**Ongoing Denial of Reasonable Accommodations – Second Failure to Transfer**

62. Veritiss denied Mr. Salmoiraghi's second request for a transfer.

**Mr. Salmoiraghi's Loss of Common Access Card Access**

63. Without any notification, on October 10, 2013, Veritiss revoked Mr. Salmoiraghi's Common Access Card (CAC) access - this is the DOD badge given to contractors to access the base and facility.  This meant that they removed him from the contract and subsequent access to the facility.  Yet another act of reprisal on the basis of filing his EO complaint and for him and his counsel's efforts to have a conversation with Veritiss management about his employment concerns.

**Mr. Salmoiraghi's Termination**

64. Also on October 10th,  Mr. Salmoiraghi's counsel emailed Ms. Powell and HR in a final attempt to speak with them about his employment concerns because they feared that Ms. Powell would try and tamper with Mr. Salmoiraghi's security clearance in a final act of retaliation.

65. Immediately after Mr. Salmoiraghi's counsel sent an email to Ms. Powell, Mr. Salmoiraghi received a notice of termination from Mr. Kiger (CFO) stating that his termination would be effective the next day, October 11, 2013.

66. The stated reason for his termination was the loss of his security clearance. There were no other stated reasons for termination.

**Veritiss' Conceded that Mr. Salmoiraghi's Security Clearance Was In Tact At the Time of His Termination**

67. On October 11, 2013, during his exit interview at Veritiss, Mr. Salmoiraghi requested that Mr. Sturmer provide him with information and documentation showing the loss of his security clearance and the reason for the loss of security clearance, but Mr. Sturmer refused to provide him with any information or documentation.

68. Eventually, Mr. Sturmer acknowledged that Mr. Salmoiraghi's security clearance was still intact and implied that the loss of his security clearance was "in the works" and that it was "in the government's hands now."

**Veritiss' Malicious Tampering with Mr. Salmoiraghi's JPAS Records (Security Clearance)**

69. Between October 7th and 9th 2013, CACI, a company interested in hiring Mr. Salmoiraghi looked up his clearance in the Joint Personnel Adjudication System ("JPAS") and found no negative information. JPAS is the system of records used by the Department of Defense to house security clearance records.

70. On October 10, 2013, the same day that Mr. Salmoiraghi's counsel sent her final communication to Veritiss as described above, a company also interested in hiring Mr. Salmoiraghi told him that there was an adverse information report in his JPAS file. This news caused Mr. Salmoiraghi grave concern.

71. Mr. Salmoiraghi contacted the Department of Defense, Defense Security Service, Office and spoke with Deputy Inspector General, Shannon Sylvester.

72. He learned three important facts that show that Veritiss retaliated against him in an effort to ruin his analyst career:

    a.   Veritiss reported on JPAS that they terminated his employment on October 9, 2013, which is false.

    b.   Veritiss filed an adverse information report of the alleged August 23, 2013 incident on JPAS on October 10, 2013, which meant that they backdated the adverse information report to the date when Mr. Turner stripped him of his supervisory authority after he requested a reasonable accommodation, as described above.

    c.   Although Mr. Salmoiraghi still possessed top security clearance at the time of his termination and thereafter, his security clearance was effectively "in limbo" because the Department of Defense Consolidated Clearance Adjudication Facility Industry Division could not adjudicate the adverse information report that Veritiss filed against him given that Veritiss had terminated him. As a result, Mr. Salmoiraghi has not been able to find a job as an analyst.

73. On October 18, 2013, Mr. Salmoiraghi's counsel advised Veritiss' attorney that Veritiss needed to cease and desist from further retaliatory measures against him. Veritiss did not respond to her.

74. Mr. Salmoiraghi's counsel later learned that Veritiss had also created an entry on Mr. Salmoiraghi's JPAS record indicting that he had PTSD, which could have also potentially negatively affected his attempts to find a job as an analyst.

75. The retaliation has continued to date as Mr. Salmoiraghi has not been able to secure a similar analyst position due to what Veritiss did to his security clearance. They ruined his ability to continue in his 14+ year career he had at the time, preventing him from providing for his family, and also affected his ability to pay for his third son's cancer treatments.

76. Mr. Salmoiraghi knew that Veritiss intended to get rid of him when they tried to force him to sign a general release of liability claims statement in order to see a Defense Medical Expert of their choosing.

77. Mr. Salmoiraghi filed for unemployment benefits on October 12, 2013 and received notice on October 18, 2013 that Veritiss was contesting his eligibility for benefits.

78. Upon reviewing evidence submitted by Veritiss and Mr. Salmoiraghi's counsel, the VEC hearing officer, Jean McConnell found in Mr. Salmoiraghi's favor and granted him unemployment benefits. Ms. McConnell relied on the fact that Veritiss lied about Mr. Salmoiraghi losing his security clearance in ruling in his favor.

79. Ms. McConnell also noted that Mr. Salmoiraghi's security clearance was effectively suspended because Veritiss terminated him.

80. Between March 2014 and June 2015, Mr. Salmoiraghi received many offers of employment, but was not hired due to the clearance adjudication issue Veritiss caused, and the time that had passed in which he had not used his clearance.

81. The case timeline shows that Veritiss demoted Mr. Salmoiraghi then re-promoted him, then fired him because he involved a lawyer (and he was physically threatened during the investigation - and then told that he was not physically threatened after he complained about it personally and through his lawyer), and then, after firing him unjustly - they backdated a

clearance issue in the system - and then defamed him to the Virginia Employment

Commission in an effort to prevent him from receiving unemployment benefits.

**Damages**

82. Mr. Salmoiraghi was not expecting Veritiss to ruin his analyst career after he alerted them of
his PTSD/AD and requested reasonable accommodations, especially given that he had been
promoted and called a top-performing analyst prior to Veritiss learning of his disability and
reasonable accommodation requests.

83. When Veritiss retaliated against Mr. Salmoiraghi by tampering with his security clearance,
they ignored the affects it would have on his livelihood and ability to earn a living for his
family.

84. Mr. Salmoiraghi and his wife were expecting a new baby in December 2013, a month after
he was unexpectedly terminated.

85. Mr. Salmoiraghi served his country in the analyst community for over 14 years, yet with the
incident reported Veritiss maliciously filed in his JPAS record, he found it impossible to find
a job within the analyst community.

86. Mr. Salmoiraghi was a valued intelligence analyst at Veritiss until he asked for a reasonable
accommodation on August 22, 2013.

87.   Mr. Salmoiraghi is disappointed at how Veritiss has handled these matters to date,
especially regarding the unlawful termination and the JPAS tampering.

88.   He takes these matters seriously, given the harm that he has suffered professionally,
physically, economically, and emotionally, due to the disability discrimination and retaliation he
faced.

14

89.     After he was unlawfully terminated from Veritiss, he was deprived of his salary and benefits to provide for his family (wife and three kids).

90.     Mr. Salmoiraghi would like to put this matter behind him and move on with his life, but he is a changed man. The work-related stress and humiliation took a toll on Mr. Salmoiraghi's physical health.

91.     The termination also had a tremendous impact on his emotional and psychological well-being. Mr. Salmoiraghi now suffers from depression, insomnia and regularly saw a therapist due to the work-related stress.

92.     Mr. Salmoiraghi's damages continue to mount every day that he is unable to find comparable work despite his best efforts to secure employment.

### COUNT I: DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA

93.     Plaintiff re-alleges, adopts and incorporates by reference all averments in the foregoing paragraphs.

94.   Under the ADA, it is an unlawful employment practice for an employer to discriminate against any individual with respect to the terms, conditions, or privileges of employment because of an individual's disability.  42 U.S.C. § 12101.

95.   Plaintiff was fully qualified to perform his position and had performed successfully in his role.

96.   Despite his qualifications, Defendant discriminated against Plaintiff in violation of the ADA by subjecting him to different and adverse treatment on the basis of his disability. More specifically, Plaintiff was subjected to less favorable terms and conditions of employment because of his disability, as described above, in violation of the ADA.

97. By reason of the continuous nature of Defendant's discriminatory conduct, which persisted throughout the employment of Plaintiff from the time he is entitled to application of the continuing violations doctrine to all violations alleged herein.

98. Mr. Salmoiraghi's supervisors, showed discriminatory animus when they refused to engage in the interactive process or to substantively address the discrimination issues he continually complained about.

99. Veritiss treated Mr. Salmoiraghi, less favorably than it treated its other similarly situated employees with regards to its LWOP leave policies.

100. Mr. Salmoiraghi suffered an adverse employment action when Veritiss intentionally terminated him, as described above.

101. Defendant's conduct was intentional, deliberate, malicious, and recklessly indifferent to Plaintiff's statutory rights.

102. Defendant's policies, practices and/or procedures have produced a disparate impact on Plaintiff with respect to terms and conditions of employment.

103. Plaintiff has been damaged as a result of Defendant's willful, intentional and unlawful conduct.  As a direct and proximate result of Defendants' conduct, Plaintiff has suffered, continues to suffer, and will in the future suffer humiliation, distress, embarrassment, inconvenience, mental anguish, pain, suffering, injury and damages, including damage to his reputation and good will, backpay loss of employee benefits, litigation expense including attorney's fees, and other damages.

104. By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of the ADA, including an award of punitive damages.

## COUNT II: DISABILITY DISCRIMINATION IN VIOLATION OF THE VHRA

105.    Plaintiff re-alleges, adopts and incorporates by reference all averments in the foregoing paragraphs.

106.    Under the Virginia Human Rights Act, it is an unlawful employment practice for an employer to discriminate against any individual with respect to the terms, conditions, or privileges of employment because of an individual's disability.  Va. Code Ann. § 2.2-3900 *et seq.*

107.    Plaintiff was fully qualified to perform his position and had performed successfully in his role.

108.    Despite his qualifications, Defendant discriminated against Plaintiff in violation of the VHRA by subjecting him to different and adverse treatment on the basis of his disability. More specifically, Plaintiff was subjected to less favorable terms and conditions of employment because of his disability, as described above, in violation of the VHRA.

109.    By reason of the continuous nature of Defendant's discriminatory conduct, which persisted throughout the employment of Plaintiff from the time he is entitled to application of the continuing violations doctrine to all violations alleged herein.

110.    Mr. Salmoiraghi's supervisors, showed discriminatory animus when they refused to engage in the interactive process or to substantively address the discrimination issues he continually complained about.

111.    Veritiss treated Mr. Salmoiraghi, less favorably than it treated its other similarly situated employees with regards to its LWOP leave policies.

112.    Mr. Salmoiraghi suffered an adverse employment action when Veritiss intentionally terminated him, as described above.

113.   Defendant's conduct was intentional, deliberate, malicious, and recklessly indifferent to Plaintiff's statutory rights.

114.   Defendant's policies, practices and/or procedures have produced a disparate impact on Plaintiff with respect to terms and conditions of employment.

115.   Plaintiff has been damaged as a result of Defendant's willful, intentional and unlawful conduct.  As a direct and proximate result of Defendants' conduct, Plaintiff has suffered, continues to suffer, and will in the future suffer humiliation, distress, embarrassment, inconvenience, mental anguish, pain, suffering, injury and damages, including damage to his reputation and good will, backpay loss of employee benefits, litigation expense including attorney's fees, and other damages.

116.   By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of the VHRA.

## COUNT III: RETALIATION IN VIOLATION OF THE ADA

117.   Plaintiff re-alleges, adopts and incorporates by reference all averments in the foregoing paragraphs.

118.   Under the ADA, it is an unlawful employment practice for an employer to retaliate against any individual by taking an adverse action because of the individual's protected activity.

119.   Plaintiff engaged in protected activity and Veritiss was aware of his protected activity, as described above.

120.   Veritiss subjected Plaintiff to retaliation for him engaging in protected activity, as described above.

121.   Plaintiff was fully qualified to perform his position as an analyst.

122. At the time Veritiss terminated Plaintiff's employment, Veritiss management was aware that Plaintiff had complained about disability discrimination, retaliation, and the hostile work environment.

123. Veritiss' conduct, culminating in the decision to terminate Plaintiff, would likely dissuade a reasonable worker from raising disability discrimination, retaliation, and hostile work environment complaints against the company.

124. Veritiss' conduct of terminating Plaintiff under false pretenses was done in retaliation for Plaintiff's protected activity under the ADA.

125. Defendant's conduct was intentional, malicious, and recklessly indifferent to Plaintiff's statutory rights.

126. Plaintiff has been damaged as a result of Defendant's willful, intentional and unlawful conduct.  As a direct and proximate result of Defendants' conduct, Plaintiff has suffered, continues to suffer, and will in the future suffer humiliation, distress, embarrassment, inconvenience, mental anguish, pain, suffering, injury and damages, including damage to his reputation and good will, backpay loss of employee benefits, litigation expense including attorney's fees, and other damages.

127. By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of the ADA, including an award of punitive damages.

## COUNT IV: HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE ADA

128. Plaintiff re-alleges, adopts and incorporates by reference all averments in the foregoing paragraphs.

129. The ADA prevents employers from subjecting employees to a hostile work environment due to their membership in a protected status group.

130.     Mr. Salmoiraghi is in a protected status group as an African American firefighter.

131.     Defendant created a hostile work environment by allowing Ms. Powell, Mr. Gotwalt, Mr. Turner, and Mr. Sturmer to harass Plaintiff due to his protected status group and their perceptions of him due to his disability disclosure.

132.     Ms. Powell, Mr. Gotwalt, Mr. Turner, and Mr. Sturmer's conduct was based on his disability and was sufficiently severe or pervasive when it altered the conditions of his employment and created an abusive and fearful work environment that was imputable to Defendant.

133.     Plaintiff has been damaged as a result of Defendant's willful, intentional and unlawful conduct.  As a direct and proximate result of Defendants' conduct, Plaintiff has suffered, continues to suffer, and will in the future suffer humiliation, distress, embarrassment, inconvenience, mental anguish, pain, suffering, injury and damages, including damage to his reputation and good will, backpay loss of employee benefits, litigation expense including attorney's fees, and other damages.

134.   By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of the ADA, including an award of punitive damages.

**PRAYER FOR RELIEF**

**NOW, WHEREFORE,** Plaintiff prays this Court to:

a.  Enter judgment in her favor against Defendant;

b.  Declare that the conduct of Defendant is a willful violation of the Plaintiff's rights as secured by the ADA and VHRA;

c.  Award Mr. Salmoiraghi punitive damages in an amount to be shown at trial;

d.  Award Mr. Salmoiraghi full back pay including salary, benefits, entitlements, loss of professional status and career-enhancing opportunities, bonuses, cash awards, loss of retirement savings and benefits, and other remuneration and privileges of employment retroactive to the date of any unlawful action found to have occurred in this case;

e.  Award Mr. Salmoiraghi front pay and pecuniary and out-of-pocket expenses;

f.  Order Defendant to pay all reasonable attorneys' fees, court costs, and expenses incurred by Mr. Salmoiraghi as a result of Defendant's actions and inactions, as well as pre- and post-judgment interest;

g.  Grant Mr. Salmoiraghi such other and further relief as justice may require and are within the equitable powers for this honorable Court.

## JURY DEMAND

Plaintiff seeks trial by jury on all matters and issues that can be so tried.

Dated: November 4, 2019                    Respectfully Submitted,

**JOSEPH SALMOIRAGHI**
By Counsel:


/s/ Monique A. Miles
Monique A. Miles, Esq.
Virginia Bar No. 78828
Old Towne Associates, P.C.
216 South Patrick Street
Alexandria, VA 22314-3528
Phone: 703-519-6810
mmiles@oldtowneassociates.com
http://oldtowneassociates.com

*Counsel for Plaintiff*

21