UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JOSEPH SALMOIRAGHI,

        Plaintiff,

    v.

VERITISS, LLC,

        Defendant.

Civil No. 1:19-cv-01405-MSN-TCB

## MEMORANDUM OPINION

This matter comes before the Court on defendant Veritiss, LLC's Motion for Summary Judgment (Dkt. No. 52). On November 4, 2019, plaintiff Joseph Salmoiraghi brought suit in this Court, alleging that defendant violated the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*, ("ADA") by discriminating and retaliating against him after learning he suffers from Post-Traumatic Stress Disorder/Anxiety Disorder ("PTSD/AD").[1] Defendant moves for summary judgment arguing that plaintiff has failed to show that any such unlawful activity occurred. For the reasons stated below, defendant's motion shall be granted and judgment entered in favor of defendant.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Pursuant to Local Rule 56(B), defendant included thirty-six paragraphs in its statement of undisputed facts. *See* Def.'s Stmt. of Facts ("SOF") (Dkt. No. 53-1). Plaintiff purports to dispute twenty-seven of those paragraphs in his opposition brief. *See* Pl. Opp. (Dkt. No. 65) at 4–18. However, plaintiff fails to properly address many of the constituent facts contained within those

---

[1] Plaintiff also alleged that defendant created and maintained a hostile work environment, but the Court dismissed that claim under Fed. R. Civ. P. 12(b)(6). *See* Dkt. No. 18.

disputed paragraphs and often fails to adequately dispute those facts he does address.[2] After exhaustive examination of the record and as set forth below, the Court finds certain facts to be undisputed despite plaintiff's efforts to place them in dispute. *Cf. Apedjinou v. Inova Health Care Services*, Case No. 1:18-cv-00287, 2018 WL 11269174, at *1 (E.D. Va. Dec. 19, 2018) ("The nonmovant's failure to respond to a fact listed by the movant or to cite to admissible record evidence constitutes an admission that the fact is undisputed."); *Cincinnati Ins. Co. v. American Glass Indus.*, Case No. 1:07-cv-1133, 2008 WL 4642228, at *1 (E.D. Va. Oct. 15, 2008) ("the Court assumes that facts alleged in the motion for summary judgment are admitted unless controverted by the responding opposition brief") (internal quotations omitted).[3]

The Court's review of the record reveals the following undisputed facts:

---

[2] For example, defendant states: "In May of 2013, Veritiss received complaints from several members of Mr. Salmoiraghi's team about his management style." SOF ¶ 7. Plaintiff states he disputes the representation "that Veritiss received complaints from 'several members' of Plaintiff's team regarding his management style[, because o]ut of the 13 employees under Plaintiff's supervision, only 5 employees brought forth false *allegations* against plaintiff." Pl. Opp. at 4 (emphasis in original). Plainly, if defendant received complaints against plaintiff from five members of his team, it "received complaints from several members" of his team regardless of the veracity of those complaints.

[3] The Court need not consider plaintiff's own statement of disputed and undisputed material facts, Dkt. Nos. 65-1 and 65-2, because non-moving parties may respond to a motion for summary judgment only in the manner provided by the Federal and Local Rules of Civil Procedure. *See* Fed. R. Civ. P. 56, E.D. Va. Loc. R. 56; *see also Kashif v. PNC Bank, N.A.*, Case No. 1:20-cv-01118, 2021 WL 5579759, at *1 n.1 (E.D. Va. Nov. 29, 2021) (same); *Blanch v. Hexagon US Federal, Inc.*, Case No. 1:17-cv-00613, 2018 WL 4997644, at *1 (E.D. Va. Oct. 15, 2018) ("[Plaintiff] proffers his own 'Statement of Additional Undisputed Facts' and a chart of 'Disputed Material Facts.' This clear violation of the Local Rule . . . is grounds for striking [plaintiff]'s Opposition and deeming [defendant]'s putative facts admitted.").

Background

1.      Veritiss is a woman-owned, service disabled veteran-owned small business that provides intelligence analysis and other services to the United States Government. SOF ¶ 1. Veritiss employees receive an "Employee Handbook" upon being hired. SOF ¶ 5. Veritiss's policies for investigating workplace complaints and the process for requesting personal or other leave are set forth therein. Def. Ex. 5 (Dkt. No. 53-5). The following policies are relevant here:

–   **Policy 4.3 (EEO and Affirmative Action)** "Any discrimination complaint should be brought to the attention of Human Resources if resolution is not possible through normal channels of supervision. Complaints will be thoroughly reviewed and appropriate action taken where necessary." *Id.* at 9.

–   **Policy 4.5 (Harassment)** "All complaints [of harassment] will be taken seriously and will be promptly reviewed and investigated and appropriate action taken, including possible disciplinary action up to and including dismissal of the harassing employee. Confidentiality will be maintained consistent with the need to investigate and review the incident." *Id.* at 10.

–   **Policy 6.9 (Security Clearances)** "Many of [Veritiss's] contracts require security clearances. Should you be unable to secure the required clearance, Veritiss will make every effort to place you in another position depending upon the reason for not obtaining the clearance. If no other position is available, you will be placed on layoff status." *Id.* at 20.

–   **Policy 6.14.5 (Leave Without Pay/Leave of Absence)**[4] "Employees must request LWOP/leave of absence in writing from their immediate supervisors with as much advance notice as possible to ensure full consideration. Requests for leave without pay will be honored for compelling reasons, but management reserves the right to deny any request that significantly impacts work schedules or is not satisfactorily substantiated." *Id.* at 24.

---

[4] Leave Without Pay also is referred to as "LWOP".

June 2012 – June 2013

2.     Defendant hired plaintiff on June 4, 2012 to work as an intelligence analyst on a highly sensitive classified contract for the United States Department of Defense ("DoD"). SOF ¶ 2. Defendant referred to that contract as "Contract 0054," the work for which only could be performed in a secure Government facility at the Marine Corps Base Quantico, Virginia. *Id.* Access to that facility required a security badge (otherwise referred to as a Common Access Card). *Id.*

3.     Defendant explicitly conditioned plaintiff's employment on the Government's acceptance of plaintiff's qualifications (which included a Top Secret security clearance), as well as plaintiff's maintenance of those qualifications and "other U.S. Government authorizations, which would include a government agency grant of access to the classified information" plaintiff would engage with while working on Contract 0054. SOF ¶¶ 3–4.

4.     On January 30, 2013, plaintiff received his 180-day performance review. Pl. Ex. 4 (Dkt. No. 65-6). The evaluation had a three-tiered criteria system: "Exceeds Objectives," "Achieves Objectives," and "Does Not Meet Objectives." *Id.* Plaintiff primarily received "exceeds" marks in each category. *Id.* However, plaintiff received an "achieves" grade for his communication skills and "N/A" notations regarding his leadership and management skills. *Id.*

5.     In February 2013, defendant promoted plaintiff to "team lead" on Contract 0054. SOF ¶ 6. A pay increase of $10,000 accompanied that promotion. *Compare* Def. Ex. 4 (Dkt. No. 53-4) *with* Def. Ex. 7 (Dkt. No. 53-7). Plaintiff's continued employment on Contract 0054 remained "expressly contingent upon his maintenance of his DoD security clearance, as well as other necessary documentation including badges or equipment provided to him that was required for him to do his job." SOF ¶ 6.

6.      At approximately the same time, plaintiff orally "self-reported" to his immediate supervisor, Joel Turner (Senior Intelligence Analyst/Quantico Site Lead) and Ronald Sturmer (Veritiss Program Manager) that he suffered from PTSD/AD and would need to manage his condition by "tak[ing] short breaks and walks." SOF ¶ 9. It is disputed whether plaintiff contemporaneously or only later requested that Turner and Sturmer also "address any issue with [p]laintiff that could cause him anxiety or stress immediately, rather than delaying the conversation." Pl. Opp. at 6. Regardless, neither Turner nor Sturmer "understood [plaintiff] to be making a request for a special accommodation in relation to his PTSD[/AD]" through that oral self-reporting. SOF ¶ 9.

7.      On May 3, 2013, Carmen Powell (Veritiss's President and CEO) received an email signed by five members of the Contract 0054 team. Def. Ex. 9 (Dkt. No. 53-9). The employees complained about what they characterized as inappropriate and unprofessional behavior by plaintiff. SOF ¶ 7. Specifically, plaintiff was described as "rude, unhelpful, and dismissive towards his team." Def. Ex. 9.

8.      Turner  and Sturmer were copied on the message. Def. Ex. 9. Three days later, Turner met with plaintiff to discuss the "workplace and leadership issues" contained therein. SOF ¶ 8; Def. Ex. 10 (Dkt. No. 53-10). Turner followed up two days after that with a written Memorandum for the Record ("MFR"). Def. Ex. 10. That MFR outlined eleven "[k]ey issues" and "solutions to implement" regarding the same. *Id.* Both Turner and plaintiff signed the MFR. *Id.*

9.      On June 12, 2013, plaintiff received his annual review. Pl. Ex. 6 (Dkt. No. 65-8). His score for "interpersonal skills/teamwork" dropped from "exceeds" to "achieves." *Id.* Plaintiff also received "achieves" grades for his communication, ethics and integrity, and leadership. *Id.* He received an "exceeds" notation for his management skills. *Id.*

<u>August 2013 – October 2013</u>

10.      On August 22, 2013, a female Veritiss employee orally informed Turner that she had received unwanted touching from plaintiff and that plaintiff had encroached on her personal space. SOF ¶ 10. The employee also stated that plaintiff had lied to a Government representative by telling that representative of complaints against her that had not actually been made. *Id.* The female Veritiss employee committed these concerns to writing at 12:41 p.m., so that Turner would "have a record of the incident." Def. Ex. 15 (Dkt. No. 53-15). Specifically, the female Veritiss employee stated that "[t]oward the end of July . . . [plaintiff] came up from behind [her], into [her] personal space . . . [and] immediately used both of his hands and began squeezing [her] shoulders as if giving [her] a massage." *Id.* The female Veritiss employee continued that she "did not give at any time, any indication by action or word that touching [her] anywhere would be appropriate" and characterized this encounter as an incident of "unwanted touching." *Id.* Turner immediately informed Sturmer of the female Veritiss employee's complaints. *See* Def. Ex. 16 (Dkt. No. 53-16).

11.      The same day, after Turner received this information from the female Veritiss employee, plaintiff approached Turner and asked "if something was wrong because [Turner's] demeanor toward him seemed tense." SOF ¶ 12. The parties dispute much of what followed. But it is undisputed that (a) Turner told plaintiff that he was working through some "issues" involving plaintiff; (b) plaintiff asked to be told immediately what those "issues" were; and (c) Turner stated he could (or would) not share anything more at that time. *Id.*

12.      That night, James Gotwalt (Veritiss Senior Advisor)[5] received phone calls at his residence from four female Veritiss employees. SOF ¶ 13. One of those calls came from the same employee who had complained to Turner earlier in the day. *Id.* That employee informed Gotwalt

---

[5] Gotwalt did not work directly with plaintiff, nor did he supervise him. SOF ¶ 17.

that "she and three other female co-workers would [] not be reporting to work the following day because of [plaintiff]'s behavior." *Id.* Gotwalt immediately informed Sturmer of these additional employee complaints. *Id.*

13.     Sturmer then contacted Turner and directed him that, because the female employees' allegations were "still being investigated," plaintiff "was not to have any kind of supervisory functions as far as supervising personnel actions" although plaintiff still would have "supervisory function as far as reviewing reports and things of that nature . . . ." Def. Ex. 11 (Dkt. No. 53-11).

14.     The following morning, on August 23, 2013, Turner met with plaintiff and informed him that he was not to conduct any more supervisory functions. SOF ¶ 15. It is disputed whether Turner informed plaintiff of the scope or duration of that removal of supervisory responsibilities. Pl. Opp. at 7–8.

15.     On August 25, 2013, plaintiff called Turner to inform him that he had retained counsel and to ask for further details about the situation. SOF ¶ 16. Turner initially informed plaintiff that defendant was still gathering information. *Id.* Later that night, Turner informed plaintiff that the situation involved complaints of plaintiff's unwanted physical contact and inappropriate supervisory actions. *Id.*

16.     On August 26, 2013, plaintiff emailed Melissa Robinson (Veritiss's Director of Human Resources) an "EO Complaint." SOF ¶ 24. Plaintiff asserted that Turner and Sturmer had created a discriminatory and toxic work environment through the actions they took between August 22, 2013 and the present day despite having full knowledge that plaintiff suffered from PTSD/AD. SOF ¶ 24; Def. Ex. 22 (Dkt. No. 53-22).

17.     On August 29, 2013, Veritiss began its investigation into the August 22, 2013 complaints against plaintiff. SOF ¶ 17. Daniel Kilcullen[6] (a former FBI agent and member of Veritiss's management team) and Gotwalt participated in the associated witness interviews. *Id.*

18.     Kilcullen and Gotwalt interviewed four Veritiss employees that same day. Def. Ex. 17 (Dkt. No. 53-17). Each interviewee was recorded as having concerns with plaintiff's leadership style. *Id.* One interviewee mentioned that two Veritiss employees were "coerced into resigning their Veritiss employment positions" while under plaintiff's supervision; another stated that plaintiff regularly left the workplace "before the end of the client's core hours"; and multiple interviewees described plaintiff's telling of an off-color joke at the expense of a subordinate. *Id.*

19.     On August 30, 2013, Kilcullen and Gotwalt interviewed six more Veritiss employees. *Id.* Again, each was recorded as sharing the view that plaintiff was a poor leader and several mentioned that plaintiff "at least twice a week" or "often" left work early "on workdays, usually sending out an email to the contractors regarding his absence." *Id.* In addition, one male employee described an incident where plaintiff "came up behind him and massaged his shoulders, ask[ed] him 'what's up' and possibly read[] [his] email messages." *Id.*

20.     On September 3, 2013, Kilcullen and Gotwalt interviewed two more Veritiss employees—one male and one female. *Id.* Both witnesses were recorded as expressing views that plaintiff was unprofessional, and each described being "massaged" or having their shoulders "rubbed" by him from behind. *Id.* The notes from these witnesses' interviews show that both employees believed plaintiff did "not seem to understand boundaries and d[id] not respect personal space." *Id.*

---

[6] Kilcullen did not work directly with plaintiff, nor did he supervise him. SOF ¶ 17.

21. On September 5, 2013, Kilcullen and Gotwalt interviewed an additional Veritiss employee. *Id.* In the notes from that interview, the witness is said to have described plaintiff as "disrespectful and rude." *Id.* The witness also is recorded as having stated that plaintiff "often le[ft] the office building early" and that she believed he had not "worked a full week since April 2013." *Id.*

22. The same day, Robinson met with plaintiff to discuss his "EO Complaint" from August 26, 2013.[7] SOF ¶ 25. Robinson's notes from that meeting reflect that she informed plaintiff defendant would "require a written certification from his doctor or other appropriate health care provider testifying to his condition, the limitations caused by the condition, and any reasonable accommodations that may be required." Def. Ex. 24; SOF ¶ 26.

23. One week later—on September 12, 2013—Robinson met with Turner in response to plaintiff's "EO Complaint" against him. SOF ¶ 25; Def. Ex. 25 (Dkt. No. 53-25). Robinson also met with Sturmer to discuss the same. *Id.*

24. On September 13, 2013, plaintiff received a counseling statement (set forth in an MFR) from Turner. SOF ¶ 21. The MFR focused on plaintiff's "failure to comply with Veritiss policy for reporting unscheduled absences and requesting personal leave without pay." Def. Ex. 19 (Dkt. No. 53-19). It provided examples of plaintiff taking unexcused leave on August 26, 27, and 28, as well as on September 3 and 5. *Id.* The MFR concluded by cautioning plaintiff that defendant was "obligated and required by the NISPOM[8] to report questionable personal conduct to the government, and want[ed] to preclude that from happening with [plaintiff]." *Id.* Plaintiff "acknowledged receipt of th[e] MFR" but "object[ed] to certain points" and stated he would

---

[7] Robinson's notes from that meeting show that Steven M. Kiger (Veritiss CFO) attended the meeting "as a witness only." Def. Ex. 24 (Dkt. No. 53-24).

[8] National Industrial Security Program Operating Manual.

address those "specific points" through a written rebuttal "after conversation with [his] legal counsel." *Id.*

25.     On September 19, 2013, Kilcullen and Gotwalt interviewed plaintiff. Def. Ex. 17. The notes from that interview show that plaintiff largely denied the allegations raised through the other employees' interviews and reflect that the attendant discussion between Gotwalt and plaintiff got "somewhat animated." *Id.* The parties dispute what this turn of phrase was meant to capture. Pl. Opp. at 8–9. Regardless, Kilcullen and Gotwalt closed their investigation into the August 22, 2013 complaints that same day. SOF ¶ 18.

26.     On September 20, 2013, plaintiff submitted his written rebuttal to the September 13, 2013 MFR he received regarding unexcused absences. SOF ¶ 22; Def. Ex. 20 (Dkt. No. 53-20). In it, plaintiff stated that two individuals had "written statements" to rebut Turner's conclusion about plaintiff's September 3, 2013 absence, but plaintiff failed to append or otherwise provide those statements.[9] Def. Ex. 20. In addition, plaintiff stated that he did not inform Turner of his other absences because "prior legal counsel" had advised him "to not have any further communication with Mr. Turner to prevent an already hostile work environment created by Mr. Turner from escalating." *Id.* Nonetheless, plaintiff acknowledged that he "did fail to provide proper Veritiss LWOP Vacation Request forms," that he "realize[d] this was wrong" and represented he would "not bypass proper procedure again." *Id.*

27.     On September 23, 2013, Sturmer informed plaintiff that, based on defendant's investigation and effective immediately, plaintiff no longer would serve as the team lead on Contract 0054 and instead would "return to the position of analyst." SOF ¶ 20. Plaintiff, however, would retain the higher salary he had been receiving as team lead. *Id.* Sturmer also issued plaintiff

---

[9] It is also worth noting that plaintiff elsewhere made clear that his September 5th absence was tied to his meeting with Robinson, in connection with his "EO Complaint." *See* Pl. Ex. 13 (Dkt. No. 65-15).

a written MFR regarding the same. Def. Ex. 18 (Dkt. No. 53-18). In it, Sturmer made clear that plaintiff's change in title was the direct result of defendant's investigation of the August 22, 2013 complaints—the results of which "caused [defendant] to lose confidence in [plaintiff's] abilities and judgment as a leader." *Id.* The MFR continued that "[s]ome of the particularly egregious issues that were brough to Veritiss'[s] attention during the course of the investigation include[d] multiple instances of inappropriate physical contact . . .; the allegation that [plaintiff] directed a racial epithet . . . toward an African American member of the team; that [plaintiff's] attempts at humor were either inappropriate . . . or threatened to disclose sensitive information . . .; and numerous complaints about [plaintiff's] tone and interactions with subordinates . . . and with the government client." *Id.*

28.     The same day, plaintiff "asked to be transferred to [one of defendant's] contracts at Crystal City or Bolling Air Force so that he would be removed from Mr. Turner's supervision." SOF ¶ 27. Sturmer responded to plaintiff on September 24, 2013 by informing plaintiff that defendant did "not currently have any intelligence analyst positions, open or otherwise, in either Crystal City, Bolling, or the immediate areas, like Ft. Belvoir. . . . The next potential in that area will probably not come out until near the end of the year." Def. Ex. 26 (Dkt. No. 53-26).

29.     On September 28, 2013, Sturmer again wrote to plaintiff. SOF ¶ 23. Sturmer stated that, because plaintiff had "essentially exhausted paid personal leave, any further use of unscheduled LWOP, *e.g.*, for illness, must be accompanied by a statement from a competent medical authority." Def. Ex. 21 (Dkt. No. 53-21). Plaintiff responded on October 1, 2013 that he did not interpret defendant's policy for taking leave to require any such note and voiced his belief that Sturmer's request was discriminatory. *Id.*

30.     On October 2, 2013, plaintiff provided Robinson with a letter from his therapist (a licensed clinical social worker). SOF ¶ 28. Plaintiff's therapist stated that plaintiff felt his current work environment "present[ed] a constant threat" that made him feel "hyper-vigilant and unable to concentrate on his work." Def. Ex. 27 (Dkt. No. 53-27). Plaintiff's counselor also wrote that "[c]ontinued exposure to such a stressful environment will adversely affect [plaintiff]'s health" and opined that plaintiff would "benefit from a change in work project and location, to reduce exposure to people he learned he cannot trust." *Id.* The letter concluded that it "would seem a reasonable accommodation to [plaintiff] to place this hard-working, valuable employee in a setting more conducive to his productivity, and more conducive to his health and well-being." *Id.*

31.     On October 7, 2013, Robinson again met with plaintiff.[10] SOF ¶ 29. There, Robinson informed plaintiff that she had interviewed Turner and that defendant had determined there was "no basis" for plaintiff's claims of discrimination. Def. Ex. 28. In addition, Robinson informed plaintiff that he would be placed on paid administrative leave. *Id.*

32.     On October 9, 2013, Robinson informed plaintiff that she had received the October 2, 2013 letter from his therapist and stated it "raised significant concern about the implications of [plaintiff's] condition." Def. Ex. 29 (Dkt. No. 53-29); *see also* SOF ¶ 29. Robinson continued that "[g]iven the concerns raised about [plaintiff's] ability to perform [his] current job with [his] current team, it [wa]s imperative that [defendant] better understand [plaintiff's] limitations so that it c[ould] satisfy its obligation to protect the government mission and [plaintiff's] co-workers and to safeguard the highly sensitive, classified information with which [plaintiff] work[ed]." *Id.* Robinson further informed plaintiff that "to obtain information needed to allow [defendant] to evaluate [plaintiff's] request for an accommodation, [defendant] . . . require[ed] that [plaintiff]

---

[10] Kiger attended this meeting as a witness. Def. Ex. 28 (Dkt. No. 53-28).

receive an evaluation by a qualified healthcare provider of [defendant's] choice." *Id.* Accordingly, Robinson directed plaintiff to "promptly take the following action:" (1) contact Dr. Todd Christiansen (defendant's choice of qualified healthcare provider), who was holding open an appointment window at 7:30 a.m. the next day; (2) forward to Robinson a confirmation email from Dr. Christiansen's office regarding that appointment within an hour; and (3) return a signed copy of defendant's "Medical Examination Consent and Release Form" within the hour.[11] *Id.* Fifteen minutes later, plaintiff responded: "[r]eceived." *Id.*

33.    Separately, but also that afternoon, Powell and Sturmer met with representatives from defendant's Government client and briefed those representatives on plaintiff's current situation, "including the issues raised by employees in August 2013, through the statement they had just received from [plaintiff's] therapist." SOF ¶ 32. In response, defendant's Government client "immediately cut off [plaintiff's] access to the [Quantico] facility, made clear that [the conduct described by Powell and Sturmer] should be reported by defendant in 'JPAS'[12] and instructed [defendant] that [plaintiff] should not return to the premises at Quantico until he was cleared." SOF ¶ 33.

34.    On October 10, 2013, plaintiff received an auto-generated email informing him that a Government employee had disabled plaintiff's Common Access Card. Def. Ex. 32 (Dkt. No. 53-32). The same day, Kiger informed plaintiff he would be terminated effective October 11, 2013 due to his "loss of appropriate government security clearance." Pl. Ex. 38, 39 (Dkt. Nos. 65-40,

---

[11] The "Medical Examination and Consent Form" contained the following limited release of liability: "I release and discharge Veritiss LLC, its representatives, and the designated medical personnel, agents, or authorized testing laboratories from any claims or potential liability relating to the examination." Def. Ex. 30 (Dkt. No. 53-30). Plaintiff ultimately did not sign that Examination and Consent form. On the evening of October 9, 2013, plaintiff's counsel contacted Powell to (1) request defense counsel's name, (2) state she had "serious concerns about the content of Ms. Robinson's email and the release form" provided by Robinson, and (3) and inform Powell that she had "advised [plaintiff] not to sign the release and not to attend any medical examination until [plaintiff's counsel was] able to speak with [defendant's] attorney." Pl. Ex. 50 (Dkt. No. 65-52).

[12] Joint Personnel Adjudication System.

65-41). Defendant—which had no other positions available at that time—also entered an incident report on JPAS regarding plaintiff's "Personal Conduct" and "Emotional, Mental and Personality Disorders" from August 23, 2013 through the date of entry. SOF ¶ 36; Def. Ex. 33 (Dkt. No. 53-33).

35.     On November 4, 2019, this suit followed. *See* Dkt. No. 1. And on January 14, 2022, defendant moved for summary judgment on all counts. *See* Dkt. No. 52.

## II.     LEGAL STANDARD

Summary judgment is proper where, viewing the facts in a light most favorable to the non-moving party, there remains no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Evans v. Tech. Apps. & Servs. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996). A party opposing a motion for summary judgment must respond with specific facts, supported by proper documentary evidence, showing that a genuine dispute of material fact exists and that summary judgment should not be granted in favor of the moving party. *Anderson*, 477 U.S. at 250. As the Supreme Court has held, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4th Cir. 2003) (quoting *Anderson*, 447 U.S. at 247–48). A dispute over an issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 446 U.S. at 248.

On a motion for summary judgment in an employment case, the Court is not required to accept conclusory assertions regarding plaintiff's own state of mind, motivations, or perceptions regarding the employment actions at issue. *See Goldberg v. B. Green and Co., Inc.*, 836 F.2d 845, 848 (4th Cir. 1988).

III.    **DISCUSSION**

a.    **Plaintiff's Claim of Discrimination**

To establish a claim of disability discrimination under the ADA, plaintiff must either offer sufficient direct evidence of discrimination or proceed under the familiar *McDonnell Douglas* burden-shifting framework. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 49–50 & n.3 (2003). Because plaintiff offers no direct evidence of discrimination, he must make his *prima facie* case by showing that: (1) he was a qualified individual with a disability; (2) he suffered an adverse employment action; (3) he was satisfying his employer's legitimate expectations at the time of the adverse action; and (4) the circumstances surrounding the adverse action raise a reasonable inference of unlawful discrimination. *Ullrich v. CEXEC, Inc.*, 233 F. Supp. 3d 515, 530 (E.D. Va. 2017).

Here, defendant argues that plaintiff cannot do so. When considering the undisputed facts and evidentiary record against the above legal standard, and for the reasons stated below, the Court agrees. Defendant's motion must be granted with respect to plaintiff's claim of discrimination.

i.    *Adverse Employment Action*

An adverse employment action in the discrimination context is one that "adversely 'affect[s] employment or alter[s] the conditions of the workplace.'" *Laird v. Fairfax Co.*, 978 F.3d 887, 893 (4th Cir. 2020) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006)). The most common forms of adverse employment actions include "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Anderson v. School Board of Gloucester Co.*, Case No. 3:18-cv-745, 2020 WL 2832475, at *16 (E.D. Va. May 29, 2020) (internal quotations omitted); *see also Jensen-Graf v. Chesapeake Employers' Ins. Co.*, 616 F. App'x 596, 598 (4th Cir. 2015) (to plead

an adverse employment action, plaintiff was required to allege she "received lower pay, was demoted, was passed over for a promotion, failed to receive a bonus, or [was] given significantly different responsibilities because she was placed on [a performance improvement plan]").

Plaintiff argues he suffered eight adverse employment actions between August and October of 2013. *See* Pl. Opp. at 20–21. Namely, plaintiff asks the Court to find the following eight actions defendant took constituted "adverse employment actions": (1) stripping plaintiff of some supervisory authority on August 23, 2013; (2) not permitting plaintiff to transfer job sites despite his request on September 23, 2013; (3) counseling plaintiff in response to "false allegations" against him, as reflected in the September 23, 2013 MFR; (4) removing plaintiff's title of "team lead" on Contract 0054 despite allowing him to retain the same salary; (5) ignoring plaintiff's "attempts to address his disability concerns and his harassment complaint"; (6) requiring plaintiff to provide a statement from a competent medical authority before permitting him to take LWOP effective September 28, 2013; (7) terminating plaintiff effective October 11, 2013; and (8) filing an adverse JPAS report regarding plaintiff on October 10, 2013. *Id.*

Defendant responds that—at most—the only legally cognizable "adverse employment actions" that plaintiff identifies are: (1) his loss of "team lead" title; and (2) his termination.[13] Defendant's cited caselaw supports that conclusion. *See* Reply Br. (Dkt. No. 66) at 3 (citing *Valerino v. Holder*, 2013 WL 12432290, at *7 (E.D. Va. Feb. 20, 2013), *aff'd*, 539 F. App'x 256 (4th Cir. 2013)). So, too, do the cases cited by plaintiff. *See* Pl. Opp. at 20 (citing *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999)). As stated above, and as the United States Court of Appeals for

---

[13] Arguably, plaintiff's temporary loss of supervision over personnel on his team also could fall into this category. But that does not change the analysis or outcome. Under the standard discussed below, defendant has shown that this suspension of duties was made while defendant was navigating its internal investigation of the complaints made against plaintiff, so that plaintiff would cease supervising those same employees who had complained about him—at least during the pendency of the investigation. As such, there is no basis to conclude discrimination was the *only* reason defendant took this step.

the Fourth Circuit has noted, allegations of "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory authority, or reduced opportunities for promotion" are "the typical requirements for a showing of an 'adverse employment action.'" *Boone*, 178 F.3d at 255. Moreover, "disciplinary actions not resulting in lost pay or loss of position (even briefly) do not rise to the level of adverse employment actions." *Valerino*, 2013 WL 12432290, at *7; *see also Thompson v. Potomac Electric Power Co.*, 312 F.3d 645, 651 (4th Cir. 2002) (disciplinary discussions that did not result in lost pay or position were not adverse employment actions).

Accordingly, the Court finds that the following allegations do not meet the requisite standard to be considered adverse employment actions: (1) stripping plaintiff of certain supervisory duties on August 23, 2013; (2) not permitting plaintiff to transfer job sites despite his request on September 23, 2013; (3) counseling plaintiff in response to "false allegations" against him; (4) ignoring plaintiff's "attempts to address his disability concerns and his harassment complaint"; (5) requiring plaintiff to provide a statement from a competent medical authority before permitting him to take LWOP effective September 28, 2013; and (6) filing an adverse JPAS report regarding plaintiff on October 10, 2013. None constitute an "ultimate employment decision[], such as hiring, granting leave, discharging, promoting, and compensating." *Lacasse v. Didlake, Inc.*, 194 F. Supp. 3d 494, 503 (E.D. Va. 2016), *aff'd*, 712 F. App'x 231 (4th Cir. 2018) (citing *Page v. Bolger*, 645 F. 2d 227, 233 (4th Cir. 1981), *cert. denied*, 454 U.S. 892 (1981)). Only plaintiff's demotion and termination can be considered "adverse employment actions" that may proceed to the next phase of determining whether plaintiff has made a *prima facie* case of discrimination.

ii.      *Employer's Legitimate Expectations*

When determining whether a plaintiff was "satisfying [his] employer's legitimate expectations under element (3)" of the *McDonnel Douglas* framework, "it is the perception of the decision-maker that is relevant, not the self-assessment of the plaintiff." *Apedjinou*, 2018 WL 11269174, at *8.

Plaintiff attempts to meet this burden by pointing to the positive employee reviews he received in January and June of 2013. Pl. Opp. at 22–23. Yet both reviews predated the August investigation into plaintiff. And plaintiff provides no evidence other than his own assertion that he was meeting defendant's legitimate expectations for supervising other employees as a "team lead" at the time he was demoted. *Id.* at 23 (citing January and June performance evaluations). Indeed, the deposition testimony that plaintiff cites establishes the opposite. *See* Pl. Ex. 20 (Dkt. No. 65-22) ("So from . . . the time that he became the team lead, his performance was not good."); Pl. Ex. 40 (Dkt. No. 65-42) ("As a supervisor that was his job. He didn't do it very well according to the people that were under his supervision.").

Such testimony was consistent with the contemporaneous written record defendant created to show plaintiff was not performing the role of "team lead" in a manner that met defendant's standard in August and September of 2013. *See, e.g.*, Def. Ex. 17 (notes of employee interviews following August 2013 complaints), Def. Ex. 19 (September 13, 2013 MFR), Def. Ex. 18 (September 23, 2013 MFR). Specifically, Sturmer's September 23, 2013 MFR reads: "In the course of [its] investigation [into complaints defendant received from four employees], [defendant] learned information that caused it to lose confidence in [plaintiff's] abilities and judgment as a leader." Def. Ex. 18.

18

Plaintiff's only response to that conclusion is to challenge the August 2013 complaints as "fabricated" and paint the investigation into them as "biased." *See* Pl. Opp. at 22–23. But the law is clear "that in the face of substantial evidence that the employer viewed the employee as failing to meet job performance expectations, as is the case here, the employee must introduce evidence from a qualified witness, such as an expert, to define the employer's legitimate expectations and evaluate plaintiff's performance in light of those expectations." *Apedjinou*, 2018 WL 11269174, at *8. Accordingly, "an employee's opinion that the employee was meeting h[is] employer's expectations is irrelevant because it is the perception of the decision maker that is relevant to establishing a *prima facie* case of discriminatory discharge." *Id.* That standard reflects the fact that "a district court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." *Id.* (internal quotation omitted). Because plaintiff has introduced no such evidence in support of his position, he cannot meet his burden to show that he was meeting defendant's legitimate expectations for a "team lead" at the time he lost that title, regardless of plaintiff's challenges to the investigation that led defendant to its well-documented conclusion. As such, plaintiff has failed to present a *prima facie* case with respect to his demotion.

With respect to plaintiff's termination, however, the Court must proceed to the next step in the analysis. The record does not show that defendant was dissatisfied with plaintiff's work as an "analyst" during the August 23 through October 11, 2013 period. Thus, there is no evidence that plaintiff was failing to meet his employer's legitimate expectations for an analyst at the time of his termination.

### iii.  *Reasonable Inference of Discrimination*

The fourth *McDonnell Douglas* factor requires plaintiff to show the circumstances surrounding his termination raise a reasonable inference of unlawful discrimination. *Ullrich*, 233 F. Supp. 3d at 530. In light of the summary judgment standard that requires the Court to construe matters in a light favorable to plaintiff, it is worth assuming that plaintiff can satisfy this burden— that is, that plaintiff's termination soon after defendant received his therapist's letter raises a reasonable inference of unlawful discrimination based on plaintiff's PTSD/AD diagnosis.

Assuming, *arguendo,* the Court found that plaintiff satisfied this requirement, the burden would shift to defendant to "articulate some legitimate, non-discriminatory reason (or reasons) for the employment decision." *Wright v. N. Carolina Dep't of Health & Hum. Servs., Off. of Educ. Servs.*, 405 F. Supp. 2d 631, 636 (E.D.N.C. 2005). If defendant succeeded in making that showing, "the presumption of unlawful discrimination created by the *prima facie* case 'drops out of the picture' and the burden shifts back to the employee to show that the given reason was just pretext for discrimination." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)). To show "pretext" plaintiff "must establish both that the employer's reason was false and that discrimination was the real reason for the challenged conduct." *Foster v. Univ. of Maryland-E. Shore*, 787 F. 3d 243, 252 (4th Cir. 2017).

Put differently, "to establish a discrimination claim under the ADA, the plaintiff must demonstrate that the plaintiff's disability was 'more than a motivating factor: it must be the only motivating factor.'" *Apedjinou*, 2018 WL 11269174, at *7 (quoting *Davis v. W. Carolina Univ.*, 695 F. App'x 686, 688 (4th Cir. 2017)).  Accordingly, "if an employer acts with a mixed motive— both a discriminatory and nondiscriminatory reason—then the employer is not liable." *Id.* And

while this framework contains the above-identified "intermediate evidentiary burdens" that "shift back and forth," plaintiff retains "the ultimate burden of persuading the trier of fact." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011).

Here, plaintiff cannot meet that burden. Defendant appropriately notes: (1) plaintiff's employment was conditioned on his government authorization to access the Quantico worksite, and (2) plaintiff lost that authorization on October 9, 2013.[14] *See* Def. Br. at 13 ("on October 9, 2013, the Government cut off Mr. Salmoiraghi's access to the facility . . . and instructed Veritiss that Mr. Salmoiraghi should not return to the premises at Quantico until he was cleared").

Under these facts, defendant has explained that the basis for plaintiff's termination was his inability to access the Quantico jobsite, and it is irrefutable that plaintiff did, in fact, lose that access. *Id.* at 13–14. Thus, it is not possible to conclude that the *lone* basis for plaintiff's termination was his disability.

Plaintiff cannot avoid this conclusion through allegations that the underlying employee complaints and internal investigation that led defendant to raise its concerns with the Government were "improper," "substandard," or based on the testimony of "not credible witnesses." *See Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011); *Williamson v. Bon Secours Richmond Health Sys., Inc.*, 34 F. Supp. 3d 607, 616 (E.D. Va. 2014). Perhaps recognizing as much, plaintiff's sole articulated effort to avoid this outcome is to point out that (1) the official correspondence that set forth defendant's reason for his termination listed only plaintiff's "loss of the security clearance"

---

[14] To be sure, the record shows that the Government likely reached its decision to revoke plaintiff's authorization, at least in part, after it learned of the representations made in the letter plaintiff's therapist provided to defendant. But plaintiff has failed to rebut defendant's evidence that (a) during the meeting that resulted in the Government's revocation of plaintiff's access to Quantico, the entirety of plaintiff's issues at Veritiss were discussed; (b) the Government initiated the process for revoking plaintiff's access to Quantico; and (c) defendant concluded it was obligated to debrief the Government on plaintiff's status under the NISPOM.

for the work required under Contract 0054, and (2) that plaintiff never lost his Top Secret security clearance. *See* Pl. Opp. at 24.

Defendant responds that the messages communicating plaintiff's reason for termination were inexact, and that those messages should have explained that "loss of the security clearance" for the job referred to plaintiff's having lost "access to classified information, and not being able to perform his job" rather than an official change to his Top Secret security clearance. Reply Br. at 4. And while an employer's provision of shifting and inconsistent justifications for taking an adverse employment action "is, in and of itself, probative of pretext," that observation primarily applies in circumstances where the reasons provided are irreconcilably in conflict or not articulated at the time of firing, *e.g.*, explaining that someone was not hired because a superior vetoed the offer in one instance and saying it was due to a lack of open positions in another; or informing (1) an employee she was fired for incompetence, (2) the EEOC that the same employee was fired for outbursts and workplace disruption, and (3) the court that the employee's termination was for sleeping on the job and failing to follow procedures for calling in sick. *E.E.O.C. v. Sears Roebuck and Co.*, 243 F.3d 846, 852–53 (4th Cir. 2001); *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 576 (4th Cir. 2015) (finding reasons for termination were pretextual because "[a]lthough [defendant's] constellation of justifications [wa]s not internally inconsistent, many of the purported justifications were not raised at the time of termination").

In contrast, where easily reconcilable reasons are given and there is no change in the narrative surrounding the employee's termination, no such presumption of pretext attaches. *See Baldwin v. England*, 137 F. App'x 561, 564 (4th Cir. 2005) (a "proffer of consistent, though varying, reasons that [plaintiff] could not be promoted fails to support an allegation that any of those reasons [we]re false, much less that all of them [we]re a pretext for discrimination"). The

Fourth Circuit has made clear that "the plaintiff cannot seek to expose the defendant's rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity." *Hux v. City of Newport New, Va.*, 451 F.3d 311, 315 (4th Cir. 2006).

Here, it is worth noting that almost eight years passed between plaintiff's termination date and the start of discovery in this matter. When so much time has passed, contemporaneous evidence (rather than later testimony) would offer the best insight into what defendant intended to communicate on October 10, 2013 when it used the phrase "loss of security clearance." *See* Dkt. No. 22 (Sept. 15, 2021 Scheduling Order allowing discovery to "begin upon receipt of this order"). Plaintiff, however, has offered no such evidence and did not depose or offer discovery from any of the Government employees involved in terminating his access to the Quantico workplace or the individual who authored his termination email and letter.

Instead, the only clarifying evidence—apart from the actual termination email and letter— comes from defendant.[15] It includes: (1) an October 9, 2013 email Powell and Sturmer received from defendant's Government client that stated the Government had "terminated [plaintiff's] computer accounts and notified the Visitor Center that . . . [plaintiff] should not have access to [the Quantico jobsite]," Def. Ex. 31 (Dkt. No. 53-31); (2) Powell's July 15, 2014 sworn statement that on October 9, 2013, "the Government . . . terminated [plaintiff's] access to sensitive compartmented information . . . by terminating his access badge, and notified the Visitor Center at the secure facility at Quantico that . . . [plaintiff] should not have access to that location," Def.

---

[15] Plaintiff's dispute as to the reason for his termination cites only: (1) his termination email and letter, Pl. Ex. 38 & 39 (Dkt. Nos. 40 & 41); (2) a November 4, 2013 letter from a Defense Security Service Deputy Inspector General who wrote that the Department of Defense had "not revoked his clearance eligibility" while explaining that "the U.S. Government grants eligibility to access classified information and the employer grants access to classified information," Pl. Ex. 36 (Dkt. No. 65-38); (3) Powell's December 9, 2021 testimony that plaintiff "was terminated only because the Government terminated his access, all of his badges, and did not allow him to continue working at the job site," Pl. Ex. 20 (Dkt. No. 65-22); and (4) defendant's supplemental interrogatory response stating plaintiff was terminated because the Government "revoked . . . [plaintiff's] access to enter the facility where he was required to work, and terminated his ability to work on the contract for which he was hired," Pl. Ex. 41 (Dkt. No. 65-43).

Ex. 2 (Dkt. No. 53-2);[16] (3) Powell's July 15, 2014 sworn statement that "[b]ecause of [plaintiff']s loss of the access to classified information required to work on the contract for which he was hired, [she] instructed [Kiger] to notify [plaintiff] that his employment would be terminated effective October 11, 2013," *id.*; (4) Powell's December 9, 2021 testimony that plaintiff was fired because defendant's "Government customer terminated his access to work on [Contract 0054], to enter the facility, to even have access on to the base," Def. Ex. 8 (Dkt. No. 53-8); and (5) Sturmer's December 13, 2021 testimony that "loss of security clearance" meant the "same thing" as "los[s of] access" due to the Government "suspend[ing]" plaintiff's "clearance." Def. Ex. 34 (Dkt. No. 66-1).[17] Thus, defendant has continued to explain plaintiff's termination in a manner that is conceptually consistent throughout: plaintiff was terminated because he lost permission from the Government to work on Contract 0054.

On these facts, plaintiff's challenge to the phrase "loss of security clearance" fails to show pretext despite the slight changes in terminology used by defendant at different junctures in this case. Defendant was terminated because he could not work on Contract 0054. *Cf. Apedjinou*, 2018 WL 11269174, at *11 ("Although defendant may have used various terms to label [its] issues [with plaintiff], such as 'misconduct,' 'performance and conduct,' and 'scheduling issues,' these explanations all clearly identify plaintiff's attitude and unreliability as the reasons for defendants decision to terminate plaintiff's light-duty work.").

In reaching this conclusion, the Court observes that there is no evidence in the record to suggest that defendant (or its employees) exerted any control over the Government's decision to grant or revoke access to its secure facilities and the information contained therein. Accordingly,

---

[16] On July 17, 2014, Sturmer provided a sworn statement stating the same. *See* Def. Ex. 14 (Dkt. No. 53-14).

[17] Plaintiff also includes testimony from Powell that states the termination email and letter plaintiff received "should be 'loss of access,'" instead of loss of security clearance. *See* Pl. Ex. 20 (Dkt. No. 22).

the Court makes no judgment regarding defendant's deference to the Government client's ultimate decision to revoke plaintiff's authorization to access the Quantico worksite and related files. The Court only is tasked with deciding whether the resulting termination by defendant was discriminatory, and the Court finds it was not. *See Mercer v. Arc of Prince George's Cnty., Inc.*, 532 F. App'x 392, 399 (4th Cir. 2013) ("In reviewing whether an employer's decision is unlawful, the Court's task is not to decide whether the reason for termination of employment was wise, fair, or even correct, ultimately, so long as it truly was the reason for the decision."). The evidentiary record here supports that conclusion, as the fact that plaintiff lost his ability to work on Contract 0054, and the undisputed fact that defendant had no other openings available, provide the ultimate bases for plaintiff's termination.

For these reasons, defendant has shown that plaintiff cannot satisfy his burden of establishing that he was terminated due to his disability. Accordingly, plaintiff cannot show that any of the actions defendant took against him satisfy the legal requirements needed to bring a discrimination claim under the ADA. The Court will grant defendant's motion for summary judgment as to plaintiff's discrimination claim for these reasons.

### b. Plaintiff's Claim of Retaliation

To establish a claim of retaliation under the ADA, plaintiff must prove (1) he engaged in protected activity; (2) his employer took "adverse action" against him; and (3) that there was a causal connection between the protected activity and the adverse action. *Wulff v. Sentara Healthcare, Inc.*, 513 F. App'x 267, 272 (4th Cir. 2013). With respect to the causation element, "[r]etaliation claims are subject to a higher 'but for' causation standard under which Plaintiff must show the causal link between h[is] protected activity and the adverse employment action []he

suffered is so close that the adverse action would not have occurred but for the protected activity." *Lacasse*, 194 F. Supp. 3d at 503.

Plaintiff attempts to establish this causal connection by referencing the "temporal proximity" between his protected activity (*i.e.*, his filing of internal complaints and related correspondence from his counsel) and the adverse actions he suffered. Pl. Opp. at 29. In support, he cites *Smith v. Strayer Univ. Corp.*, 79 F. Supp. 3d 591, 605 (E.D. Va. 2015), which notes that "[t]emporal proximity between protected activity and the adverse employment action can be 'highly suspicious' and 'give rise to a strong inference of . . . discrimination." *See* Pl. Opp. at 29–30. Plaintiff, however, fails to include the critical qualification that "temporal proximity *alone* is insufficient to establish the third element of causation." *Smith*, 79 F. Supp. 3d at 605 (quoting *Staley v. Gruenberg*, 575 F. App'x 153, 156 (4th Cir. 2014)) (emphasis in original). That omitted qualification is dispositive.

Engaging in protected activity with prior knowledge that one's "job was in jeopardy" prevents a plaintiff from "establish[ing] the causal connection necessary between h[is] [protected activity] and [his] termination" regardless of the temporal proximity between the two. *Smith*, 79 F. Supp. 3d at 605. The *Smith* case is instructive on this point. There, the plaintiff "knew for over a month before she filed her formal request for accommodation that her job was in jeopardy." *Id.* Thus, "[i]f anything, the temporal proximity in [*Smith*] suggest[ed] to the Court that [p]laintiff was desperately attempting to save her job with [d]efendant in any way she could," including through engaging in protected activity. *Id.*

Similarly, here, plaintiff did not engage in protected activity until after he (1) learned that he was the target of employee complaints specifically regarding plaintiff's unwanted physical contact and inappropriate supervisory actions, and (2) had engaged his own counsel. *See* Pl. Opp.

at 28 (identifying protected activity as having occurred between August 26 and October 10, 2013).

Plaintiff's—and later his counsel's—escalation of ostensibly protected activity (*e.g.*, through issuing demand letters and lodging new complaints against other Veritiss employees) continued in parallel with defendant's efforts to investigate and remediate the conduct underlying the August 22, 2013 complaints against plaintiff. In such circumstances, the temporal proximity between plaintiff's engagement in protected activity and a well-documented series of otherwise viable personnel actions will not suffice to show causation where there is "no evidence that [plaintiff]'s supervisors were conspiring [against plaintiff] by creating a paper trail of 'trumped up' disciplinary charges." *Staley v. Gruenberg*, 575 F. App'x 153, 156 (4th Cir. 2014).

Within this framework, plaintiff has failed to establish the causal connection needed to support a claim for retaliation. Accordingly, defendant's motion for summary judgment on the retaliation claim also will be granted.

### c.    Reasonable Accommodations and the Interactive Process

Although not pleaded as a separate claim, both parties dedicate portions of their summary judgment briefing to plaintiff's argument that defendant failed to honor his reasonable requests for accommodation or engage in the interactive process to identify the same. *See* Def. Br. at 16–21; Pl. Opp. at 24–27. For the sake of completeness, the Court also will address these issues.

Under the ADA, the duty to engage in an interactive process to identify a reasonable accommodation is triggered when an employee communicates to his employer his disability and his desire for an accommodation for that disability. *Wilson v. Dollar Gen. Corp.*, 717 F. 3d 337, 345 (4th Cir. 2013). An employer, however, is not liable for discrimination if the employee cannot identify a reasonable accommodation that would have been possible. *Id.* at 346; *see also id.* at 345 (to prevail on a failure to accommodate claim, a plaintiff must show (1) he was an individual who

had a disability within the meaning of the ADA; (2) his employer had notice of the disability; (3) he could perform the essential functions of his position with reasonable accommodation; and (4) his employer refused to make such accommodation).

Plaintiff complains that defendant failed to engage in the interactive process and denied his requests for reasonable accommodations. Pl. Opp. at 24–27. For the reasons that follow, the Court finds both arguments fail as a matter of law.

### i.     *Failure to Engage in Interactive Process*

Plaintiff repeatedly blames defendant for failing to engage in the interactive process by (1) waiting until September to meet with plaintiff regarding his disability; and (2) ignoring communications from plaintiff's counsel. *See* Pl. Opp. at 27. The record is clear, however, that after plaintiff informed defendant's Human Resources department of his request for a reasonable accommodation, defendant promptly engaged plaintiff in discussions regarding the same. *See* Def. Exs. 23–24. The record also is clear that the only accommodation plaintiff sought through the interactive process was a job transfer, *see* Def. Exs. 23, 27, 28 & 29, and that any subsequent breakdown in related efforts to address that request cannot be placed solely at the feet of defendant. *See* Def. Exs. 23 & 29, Pl. Exs. 24 (Dkt. No. 65-26), 25 (Dkt. No. 65-27), 50 (Dkt. No. 65-52) & 52 (Dkt. No. 65-54).

"When there has been a breakdown in the interactive process, courts should attempt to isolate the cause of the breakdown and then assign responsibility. Ultimately, an employer cannot be held liable . . . where it is the employee who refuses to engage in, or causes the breakdown of, the requisite interactive process." *Stewart v. Ross*, 2020 WL 1907471, at *14 (E.D. Va. Apr. 17, 2020) (internal quotations omitted). Here, the record shows that although defendant at times ignored the demands of plaintiff's counsel, defendant never ignored plaintiff who was engaging

28

defendant's Human Resources personnel in parallel. Moreover, the record also makes clear that the interactive process only irrevocably broke down when plaintiff failed to provide defendant with the medical opinions it needed to determine the impact plaintiff's disability had on his capacity to function in the workplace. It was solely within the power of plaintiff to provide defendant with access to that information. On these facts, the Court finds plaintiff has not shown that defendant failed to engage in the interactive process with him.

### ii.    *Reasonable Accommodations*

With respect to plaintiff's reasonable accommodation arguments, he makes two claims.

*First*, plaintiff argues that defendant ignored plaintiff's request that Turner or Sturmer "address any issue with [p]laintiff that could cause him anxiety or stress immediately, rather than delaying the conversation and exacerbating his symptoms." Pl. Opp. at 6. The only time that plaintiff had this accommodation denied was on August 22, 2013. Pl. Opp. at 7. That denial occurred when Turner refused to disclose to plaintiff the details of the unwanted touching "issue" that had been brought to Turner's attention that day. Pl. Opp. at 7. The record is clear that Turner was not free to grant that accommodation under defendant's policy for investigating complaints of sexual harassment. *See* Def. Ex. 5 at 10 ("All complaints [of sexual and any other forms of employee harassment] will be taken seriously and will be promptly reviewed and investigated . . . . Confidentiality will be maintained consistent with the need to investigate and review the incident."). Thus, plaintiff's requested accommodation on August 22, 2013 was not reasonable and, therefore, is not actionable.

*Second*, plaintiff repeatedly requested a transfer to a different job site. *See* Pl. Opp. at 26. Defendant, however, has provided evidence that no openings were available at other job sites, meaning defendant could not honor plaintiff's requested accommodation. *See e.g.*, Def. Ex. 26.

The ADA "only requires reassignment to a *vacant* position as an accommodation for an employee with a disability," *Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 960 (4th Cir. 2021), and "does not require an employer to accommodate an employee by providing substitute assignments" where no vacant positions exist. *Apedjinou*, 2018 WL 11269174, at *6; *see also E.E.O.C. v. Sara Lee Corp.*, 237 F.3d 349, 355 (4th Cir. 2001) ("The ADA does not require reassignment when it would mandate that the employer bump another employee out of a particular position."). Accordingly, the record shows that plaintiff's requests for a job transfer where no vacant positions existed were not reasonable under the ADA and that defendant did not violate the ADA by refusing to staff him at a different job site where no openings existed.

Moreover, the record establishes that plaintiff's "essential job functions" required him to work on Contract 0054. *See* SOF ¶ 2. His request to work on a different contract, thus, can be construed as not reasonable for this additional reason. *See Apedjinou*, 2018 WL 11269174, at *6 (essential job function required nurse to work on the unit for which she was hired).

## IV.    CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment shall be granted. An appropriate Order shall issue.

_____
/s/
Hon. Michael S. Nachmanoff
United States District Judge

April 6, 2022
Alexandria, Virginia